In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 17-3221

KENNETH MAYLE,

*Plaintiff-Appellant,*

*v.*

UNITED STATES OF AMERICA, *et al.*,

*Defendants-Appellees.*

_____

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 17 C 3417 — **Amy J. St. Eve**, *Judge.*

_____

SUBMITTED MAY 11, 2018 — DECIDED MAY 31, 2018

_____

Before WOOD, *Chief Judge*, and MANION and ROVNER, *Circuit Judges.*

WOOD, *Chief Judge.* Kenneth Mayle, an adherent of what he calls non-theistic Satanism, sued the United States and officials from the United States Mint, Department of the Treasury, and Bureau of Engraving and Printing, to enjoin the printing of the national motto, "In God We Trust," on United States currency. The district court dismissed his complaint, and we affirm.

Mayle asserts that the motto amounts to a government en-
dorsement of a "monotheistic concept of God." Because Sa-
tanists practice a religion that rejects monotheism, they regard
the motto as "an attack on their very right to exist." Possessing
and using currency, Mayle complains, forces him (and his fel-
low Satanists) to affirm and spread a religious message "com-
mitted to the very opposite ideals that he espouses." In addi-
tion, Mayle characterizes the printing of the motto as a form
of discrimination against adherents to minority religions be-
cause it favors practitioners of monotheistic religions. All this,
Mayle asserts, demonstrates that the defendants are violating
the Religious Freedom Restoration Act (RFRA), the Fifth
Amendment's Equal Protection clause, and the First Amend-
ment's Free Speech, Free Exercise, and Establishment clauses.

In granting the defendants' motion to dismiss, the district
court, citing *Newdow v. Lefevre*, 598 F.3d 638, 645–46 (9th Cir.
2010), held that it is well-settled that the motto on currency
does not violate RFRA or the Free Exercise or Free Speech
Clauses, because the motto has *no* theological import. It dis-
missed Mayle's equal-protection claim because the currency's
appearance affects all citizens equally. The court did not re-
solve Mayle's properly preserved Establishment Clause
claim, however, and so we begin our *de novo* review there.

Mayle claims that the motto establishes religion (in the
constitutional sense) because it is inherently Christian, or at
least monotheistic, and it sends a message to nonadherents
that they are "outsiders." In order to move forward, he must
indicate in which way the government has transgressed the
Constitution: through impermissible endorsement of a reli-

gious view, through coercion, or through a forbidden religious purpose. *Freedom From Religion Found., Inc. v. Concord Cmty. Sch.*, 885 F.3d 1038, 1045 (7th Cir. 2018).

The reason all of these "tests" or approaches have developed is that the Establishment Clause does not mandate the eradication of all religious symbols in the public sphere. *Salazar v. Buono*, 559 U.S. 700, 718 (2010). Because it does not sweep that far, we know that before we can find that something runs afoul of the Establishment Clause, we must do more than spot a single religious component of a challenged activity, no matter how inconsequential. *Lynch v. Donnelly*, 465 U.S. 668, 680 (1984). To avoid that error of over-inclusion, we instead scrutinize challenged conduct "to determine whether, in reality, it establishes a religion or religious faith, or tends to do so." *Id.* at 678. We "look at the totality of the circumstances surrounding the challenged conduct from the perspective of a reasonable observer" who is aware of the practice's history and context. *Freedom From Religion Found., Inc.*, 885 F.3d at 1045.

Under the "endorsement" approach, that inquiry is designed to show whether the government is pushing for the adoption of a particular religion (or for religion over atheism, humanism, animism, or other alternative world views). The Supreme Court has observed that the motto "In God We Trust" does no such thing. The motto merely acknowledges a part of our nation's heritage (albeit a religious part). *Lynch*, 465 U.S. at 676. The Court has dismissed the notion that this symbol "pose[s] a real danger of establishment of a state church [as] far-fetched indeed." *Id*. at 676, 686.

Following this guidance, we have twice suggested that the motto, and specifically the motto on money, does not violate

the Establishment Clause. In *Sherman v. Community Consolidated School District 21 of Wheeling Township*, we said that the original religious significance of "In God We Trust" has dissipated and the motto is now secular. 980 F.2d 437, 446–48 (7th Cir. 1992). And in *American Civil Liberties Union of Illinois v. City of St. Charles*, we said that "the establishment clause is not so strictly interpreted as to forbid conventional nonsectarian public invocations of the deity, a standard example being the slogan on U.S. currency and coins: 'In God We Trust.'" 794 F.2d 265, 271 (7th Cir. 1986).

The inclusion of the motto on currency is similar to other ways in which secular symbols give a nod to the nation's religious heritage. Examples include the phrase "one nation under God," which has been in the Pledge of Allegiance since 1954, see Pub. L. No. 83-396, ch. 297, 68 Stat. 249 (1954), as well as the National Day of Prayer, which has existed in various forms since the dawn of the country and is now codified at 36 U.S.C. § 119. *Lynch*, 465 U.S. at 676–77. Moreover, when the religious aspects of an activity account for "only a fraction," the possibility that anyone could see it as an endorsement of religion is diluted. *Freedom From Religion Found., Inc.*, 885 F.3d at 1047. In the case of currency, the motto is one of many historical reminders; others include portraits of presidents, state symbols, monuments, notable events such as the Louisiana Purchase, and the national bird. In this context, a reasonable observer would not perceive the motto on currency as a religious endorsement.

Mayle's Establishment Clause claim fares no better under either of the other two approaches—coercion and purpose—the Supreme Court takes in this area. Under the former, we look to see whether the government has coerced the plaintiff

to support or participate in religion. *Town of Greece, N.Y. v. Galloway*, 134 S. Ct. 1811, 1825 (2014); *Lee v. Weisman*, 505 U.S. 577, 587 (1992); *Freedom From Religion Found., Inc.*, 885 F.3d at 1048. Mayle maintains that he has been coerced into partici-pating in Christianity because credit and debit cards are too risky and he is thus compelled by default to conduct all of his economic transactions using money with a religious message. We grant that using currency is essentially obligatory for someone such as Mayle, who eschews electronic forms of pay-ment. See *Lee,* 505 U.S. at 589. But no one walking down the street who saw Mayle would have the faintest idea what Mayle had in his pocket—currency or plastic payment cards or perhaps just a smart phone. The government has thus not coerced Mayle into advertising, supporting, or participating in religion; it has merely included on its currency the religious heritage of the country along with other traditions. See *Lynch*, 465 U.S. at 676, 686. And if, as the Supreme Court has held, public or legislative prayer does not force religious practice on an audience, see, *e.g.*, *Town of Greece*, 134 S. Ct. at 1824–28, it is difficult to see how the unobtrusive appearance of the na-tional motto on the coinage and paper money could amount to coerced participation in a religious practice.

Last, we have the "purpose" test, under which we ask whether the motto was placed on the currency for a religious purpose, or, put differently, whether its inclusion "lacks a sec-ular objective." *Freedom From Religion Found., Inc.*, 885 F.3d at 1049; see *Lemon v. Kurtzman*, 403 U.S. 602, 612–13 (1971). Mayle contends that because the Department of the Treasury admits that religious sentiment was the driving force behind the decision permanently to affix the motto to currency in 1955, its attempt now to separate secular "religious heritage" from "religious practice" is illusory. But his premise is too

simplistic. The Cold War was at its height during the mid-1950s, and so it is just as accurate to say that the motto was placed on U.S. currency to celebrate our tradition of religious freedom, as compared with the communist hostility to religion. Moreover, even if the motto was added to currency in part because of religious sentiment, it was also done to commemorate that part of our nation's heritage. See *Lynch*, 465 U.S. at 676, 686. And having just one secular purpose is sufficient to pass the *Lemon* test. *Bridenbaugh v. O'Bannon*, 185 F.3d 796, 800 (7th Cir. 1999).

Inscribing the motto on currency, Mayle argues next, violates the Free Speech Clause because the national motto conveys a religious message, which he is being forced to convey: that he "trusts" in a deity. But Mayle is not in any meaningful way affirming the motto by using currency. See *Wooley v. Maynard*, 430 U.S. 705, 717 n.15 (1977). He is not wearing a sign or driving a car displaying a slogan. See *id*. at 717. As the district court noted, most people do not brandish currency in public—they keep it in a wallet or otherwise out of sight until the moment of exchange. And the recipient of cash in a commercial transaction could not reasonably think that the payer is proselytizing. If the recipient thought about it at all, she would understand that the government designed the currency and is responsible for all of its content, including the motto. She would not regard the motto as Mayle's own speech.

Mayle also argues that, in holding and using currency, he is compelled to affirm a religious message that contradicts his Satanist beliefs, and so the motto on currency violates his rights under the Free Exercise Clause and places an undue burden on his exercise of religion for purposes of RFRA,

42 U.S.C. §§ 2000bb-1(a), (b). Under the Free Exercise Clause, the law authorizing the placement of the motto on currency is constitutional if it is neutral and generally applicable. See *Listecki v. Official Comm. of Unsecured Creditors*, 780 F.3d 731, 742 (7th Cir. 2015) (quoting *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2761 (2014) ("[N]eutral, generally applicable laws may be applied to religious practices even when not supported by a compelling government interest.")). But Mayle's claim fails because the motto's placement on currency has the secular purpose of recognizing the religious component of our nation's history, see *Sherman*, 980 F.2d at 446–47, and it does not affect current religious practices. The motto appears on all currency, in addition, which means that law in question is generally applicable.

Under RFRA, Mayle must allege plausibly that the exercise of his religion is substantially burdened by the motto's placement on currency. See *Korte v. Sebelius*, 735 F.3d 654, 673 (7th Cir. 2013). Mayle argues that having the motto printed on currency forces him to choose between using cash, a necessary part of life, and violating his sincerely held religious beliefs. Using the currency makes him feel "guilt, shame and above all else fear," and those feelings, he contends, qualify as a substantial burden. He likens himself to a fundamentalist Christian baker who would be forced to endorse gay marriage—a practice that violates his religious beliefs—by selling a couple a wedding cake. This term the Supreme Court is considering that baker's case. *Craig v. Masterpiece Cakeshop, Inc.*, 2015 COA 115, *cert. granted*, 138 S. Ct. 419 (U.S. Oct. 30, 2017) (No. 16-111). No matter how that case is decided, however, no reasonable person would believe that using currency has religious significance. See *Wooley*, 430 U.S. at 717 n.15. And because using money is not a religious exercise, and the motto

has secular as well as religious significance, Mayle has not plausibly alleged that the motto's placement on currency increases the burden on practicing Satanism. Moreover, *Hobby Lobby*, a case upon which Mayle relies, does not stand for the proposition that the government must accommodate every person who believes that a particular law is incompatible with the person's sincerely held religious beliefs. 134 S. Ct. at 2760, 2783. Unlike the plaintiffs in *Hobby Lobby* and *Thomas v. Review Board of Indiana Employment Security Division*, Mayle has not suffered a financial burden because of his religious beliefs, nor has he altered his behavior to avoid violating his religious beliefs. See *id*. at 2766, 2755; 450 U.S. 707, 709–12, 716–18 (1981). Mayle's feelings are not insignificant, but the burden he experiences is not substantial.

Mayle last attempts to state a claim under the Equal Protection component of the Fifth Amendment. He argues that the government's inclusion of what he describes as a Christian message on currency, but not any Satanist or other religious dogma, amounts to irrational government discrimination. (Christianity, of course, is not unique in its monotheism; the same can be said of Judaism and Islam, but this fact does not matter to our analysis.) We approach this as we would an equal-protection claim under the Fourteenth Amendment, see *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 217–18 (1995), while applying rational-basis scrutiny. See *St. John's United Church of Christ v. City of Chicago*, 502 F.3d 616, 638 (7th Cir. 2007) (when Free Exercise claim has failed, rational-basis scrutiny applied to religious equal-protection claim based on same facts). To proceed on this claim, Mayle must plausibly allege government action "wholly unrelated to any legitimate state objective." *Vision Church v. Vill. of Long Grove*, 468 F.3d 975, 1001 (7th Cir. 2006) (citation omitted). But as

multiple courts have said, the motto's placement on currency is related to at least one legitimate governmental objective— acknowledging an aspect of our nation's heritage. See, *e.g.*, *Lynch*, 465 U.S. at 676, 686; *Sherman*, 980 F.2d at 446–47.

For all of these reasons, we join every court that has directly addressed these issues in holding that it is neither unconstitutional nor a violation of RFRA to print the national motto on currency. See, *e.g.*, *Newdow v. Peterson*, 753 F.3d 105 (2d Cir. 2014); *Newdow v. Lefevre*, 598 F.3d 638 (9th Cir. 2010); *Gaylor v. United States*, 74 F.3d 214 (10th Cir. 1996); *O'Hair v. Murray,* 588 F.2d 1144 (5th Cir. 1978); *Aronow v. United States*, 432 F.2d 242 (9th Cir. 1970). We do so not because we think that the phrase "In God We Trust" is absolutely devoid of religious significance, but instead because the religious content that it carries does not go beyond statutory or constitutional boundaries.

We thus AFFIRM the judgment of the district court.